## Miller's Appeals.    Wilhelm's Appeals.

The parties in interest may agree, that the report of auditors, on the settlement of an executor's or trustee's account, shall be final and conclusive, and that no exceptions shall be taken thereto : and the courts will enforce such an agreement, by disregarding exceptions filed in violation thereof.

They cannot by such agreement abridge the powers of the court, nor bind creditors, or others in interest; but as between each other, it will be conclusive. Such agreement does not take away the right of the court to revise the auditor's report, but it destroys the parties' right to except to it.

An auditor's report upon a question of fact, is final and conclusive, unless there be flagrant mistake.

A contract infected with actual and positive fraud, is not merely voidable, but void ; and is incapable of confirmation without a new consideration.

In certain cases, where the parties to a fraudulent or illegal contract have fully executed it, the courts will not interfere in behalf of one of them ; but, considering them *in pari delicto*, will leave the parties bound as they find them. They will not, however, assist in carrying out an executory contract which is successfully impeached as covinous and fraudulent in fact.

An executor and trustee under a will cannot enter into a valid contract with the heir at law, by which he is to receive a portion of the estate, in case the trusts of the will be set aside by the courts.

The making of such a contract is a plain violation of his duties to the *cestuis que trust*, and, in case of a recovery by the heir at law, will confer on him no title to any part of the estate.

APPEALS from the Common Pleas and Orphans' Court of *Northampton county*.

These were four appeals from the decrees of the Common Pleas and Orphans' Court, in the matter of the accounts of Samuel Wilhelm, one of the executors, and trustee under the will of Peter Miller, late of Easton, Pennsylvania, deceased. Two of these appeals were taken by Alexander Miller, administrator of Peter Miller, late of Ohio, deceased; and two of them by Samuel Wilhelm, the accountant.

Peter Miller, of Easton, died on the 3d March 1847, having made his last will and testament, wherein, after giving legacies to certain benevolent societies, and to Samuel Wilhelm, he devised the residue of his estate to two church corporations, in trust that the real estate should not be sold, but let to good tenants, and the personal estate securely invested on bond and mortgage, the income from both to constitute a fund to accommodate farmers and mechanics with loans; and directed that, if this fund should accumulate beyond the applications made for it, the surplus should be used to erect a widows' asylum, and a number of small brick houses, for the use of respectable widows and single women, at reduced rents.

Of this residuary fund and trust, he constituted Samuel Wilhelm the receiver, financial agent, and manager, with specific powers and directions to lease, improve, and repair the real estate, and to receive the rents, issues, interest and profits of the real and personal, to deposit the moneys received in the Easton Bank, to draw it out for proper purposes on checks, to pay expenses, make loans, keep accounts, employ a clerk, &c.; for which he was to receive 2½ per cent. for his services, and the amount necessary for a clerk and books. Provision was likewise made for the appointment of a successor to Wilhelm, for visitors, inspectors of accounts, and the procurement of an Act of Assembly for the better carrying out of the provisions of the will, if necessary, by means of a corporation, &c.

The testator appointed Samuel Wilhelm, Philip H. Mattes, John Hoff, Dr. Silas Cook, and J. H. A. Bomberger, his executors; to whom letters testamentary were granted by the register of Northampton county, on the 4th March 1847, and they thereupon entered upon the performance of their duties. At the same time that Samuel Wilhelm took upon himself the office of executor, he also assumed the management of the real estate under the power in the will: he executed leases, made improvements and repairs, collected the rents and income, and paid the expenses.

Shortly after the death of the testator, Samuel Wilhelm placed himself in communication with Peter Miller, of Ohio, the testator's nephew and heir at law, he himself being the next in succession; and on the 18th February 1848, the following agreement for a division of the estate was executed between these parties:—

" Whereas, Peter Miller, deceased, lately died in Easton, Pennsylvania, having made a last will and testament, which has since been proved; and whereas, it is supposed, that the disposition of the residue of the estate of the said Peter Miller, made by his said last will and testament, is not such as will be sustained in law, in consequence of which the said residue will pass and descend to the heir at law of the said Peter Miller, deceased; and whereas, Peter Miller, of Brookfield township, Morgan county,

Ohio, claiming to be the son of John Miller, the brother of the said Peter Miller, deceased, claims to be such heir at law; and whereas, Samuel Wilhelm, of the borough of Easton, in the county of Northampton, Pennsylvania, devisee of Catharine Wilhelm, deceased, who died since the said Peter Miller, claims to be entitled to the said residue in right of the said Catharine Wilhelm, who claimed to be the first cousin of the said Peter Miller, deceased.

" And whereas, the said Peter Miller and the said Samuel Wilhelm have agreed that, if the said residuary disposition made by the said will shall be declared invalid, the residuary estate aforesaid shall be equally divided to and between the said Peter Miller and the said Samuel Wilhelm and their respective heirs and assigns, in equal shares.

"Now, it is hereby agreed, for and in consideration of the premises, and of the doubts existing as to which of the parties to this agreement will be able to make out their title to the same, and to prevent litigation in relation to the same, that in the contingency of the testamentary disposition of the estate of the said Peter Miller, deceased, being decided to be invalid in whole or in part, that all the estate, real, personal, and mixed, which shall not pass under the said will, but which would descend to the heirs and legal representatives of the said Peter Miller, deceased, as his next of kin, shall be equally divided between the said Peter Miller and Samuel Wilhelm and their respective heirs and assigns for ever; and the said parties respectively covenant and agree with each other that they will respectively execute and deliver, each to the other, his heirs and assigns, the necessary conveyances, assurances, assignments, and transfers for the said estate, real, personal, and mixed, so as to vest in each of them and their respective heirs and assigns for ever an equal moiety or half part of the said estate.

" And it is further agreed between the parties, that legal proceedings be forthwith instituted in the name of the said Peter Miller, for the speedy determination of the rights of the said parties to the said estate, and that each of them shall contribute an equal proportion of the costs and expenses of conducting said proceedings at law.

"In witness whereof the said parties to these presents have hereunto set their hands and seals, this eighteenth day of February, A. D. one thousand eight hundred and forty-eight.

" Sealed and delivered in presence of } PETER MILLER.    [Seal.]
us, Wm. Hackett, S. C. Cook, jun. } SAM'L. WILHELM. [Seal.]"

The validity of this agreement was attacked by the administrator of the heir at law, on the ground that it had been unfairly and fraudulently obtained from his father, by Wilhelm.

These parties, at the same time, entered into the following agree-

ment with their counsel, the validity of which was not disputed:—

"It is hereby agreed, that James M. Porter and Matthew Hale Jones shall be employed as our attorneys, to institute all the necessary legal proceedings to test the validity of the devises and bequests of the residue of the estate of Peter Miller, late of the borough of Easton, deceased, in Pennsylvania and New Jersey, and that their compensation shall be twenty per cent. on the total amount of the real and personal estate, which they shall recover for us, or either of us, to be paid or conveyed to them as they shall recover the several parcels or parts thereof. In the event of failure, they to make no claim on us for compensation, other than the actual expenses they shall be put to in conducting such suit or suits.

   "Easton, Pa., February, 1848. ⎫   PETER MILLER.
    "Attest, Wm. Hackett. ⎭   SAMUEL WILHELM."

An ejectment was then brought in the name of Peter Miller, in the Court of Common Pleas of Northampton county, to November Term 1848, against Abraham Hillyard, the tenant in possession, the five executors, and the two congregations named as trustees in the will, for a tract of the testator's land, situate in Forks township, which was defended by Wilhelm and the other executors; and in August 1849, this court affirmed the judgment of the court below, declaring the residuary devise and bequest to be void, and Peter Miller, the heir at law, entitled to recover. This case of Hillyard v. Miller is reported in 10 *Barr* 326.

The title of the heir at law being thus established, on the 1st September 1849, he presented his petition to the Orphans' Court for a citation to the executors to account. On the 24th October 1849, J. H. A. Bomberger filed his separate account, which was confirmed nisi. And on the 15th November 1849, John Hoff, another of the executors, filed his separate account, which was likewise confirmed nisi.

On the 28th February 1850, Samuel Wilhelm filed his separate account, in which he charged himself with items amounting to $87,154.37, and claimed credit for disbursements to the extent of $80,086.63, and exhibiting a balance of $7067.74 in his hands. In this account he charged no commissions for his services. Annexed thereto he returned a schedule of bonds, stocks, notes, &c., considered good for $55,280.41, and lost and doubtful claims amounting to $5880.77. Also a memorandum of two judgment bonds, in the hands of Philip H. Mattes, another of the executors, for $1779.47. This account was confirmed nisi, and on the 26th April 1850, Isaac C. Wikoff, B. F. Arndt, and George W. Yates, were appointed auditors, to examine and, if occasion, resettle the account, and make distribution of the balance, &c.

In the course of the examination, it was discovered, that the

account contained items of credit relating to the real estate, and other matters, which were to be settled by Wilhelm, not as executor, but as trustee under the will.  It was therefore agreed, that he should file an account, as trustee, in the Court of Common Pleas, and that it should be referred to the same auditors, so that both accounts might be examined, resettled, and adjusted, and distribution of the balances thereof made, at the same time.

Accordingly, on the 29th July 1850, Samuel Wilhelm filed his account as trustee under the will, in the Court of Common Pleas, in which he charged himself with the sum of $20,665.98 received, and claimed credit for $21,468.28, paid out and retained; leaving a balance in his favour of $802.30.  In this account he charged commissions at the rate of 2½ per cent., amounting to $1026.29. The court referred this account to the same auditors, as agreed upon by the parties.

After various meetings and adjournments, and considerable progress having been made in the adjustment of the accounts, the parties executed the following agreement, which was laid before the auditors, and returned and filed with their report:—

" Whereas, Samuel Wilhelm, acting executor, &c., of Peter Miller, late of the borough of Easton, merchant, deceased, has filed and settled his account, as such executor, before the register of the county of Northampton ; and has also filed and settled in the Court of Common Pleas of said county his account as trustee and receiver of the rents, issues, and profits of the real estate late of said deceased ; and Isaac C. Wikoff, Benjamin F. Arndt, and George W. Yates, have been appointed by the Orphans' Court and Court of Common Pleas, respectively, auditors, to examine and, if occasion, resettle the same, and make distribution thereupon, and have already entered upon their duties in the premises,—

" It is agreed as follows : That the auditors aforesaid shall, as soon as practicable, meet and give a hearing to the said Samuel Wilhelm and the party or parties taking exception to both or either of the said accounts, as well the account of the said Samuel as acting executor, as also the account of the said Samuel as trustee and receiver of the rents, issues, and profits of the real estate, and thereupon the said auditors aforesaid shall proceed to resettle the same and make distribution.

" That the said accountant shall be charged with all the bonds and mortgages mentioned in the schedule attached to his account filed in the register's office, that do not fall under the head of lost or doubtful, excepting the bond and mortgage of Silas C. Cook, dated the nineteenth day of April, one thousand eight hundred and forty-four, for seven thousand eight hundred and twenty-five dollars, and the note of the said Silas, dated the third day of April, one thousand eight hundred and forty-six, for one hundred and thirty-nine dollars, and also excepting Susan Gardner's collateral assignment for thirty dollars.

[Miller's Appeals.  Wilhelm's Appeals.]

"That Alexander Miller, administrator of his father, Peter Miller, late of Brookfield township, Morgan county and state of Ohio, deceased, shall be permitted to select from the good securities brought into the distribution by the auditors aforesaid, in full or in part of the distribution share falling to him as administrator, only such as he may deem proper; and the said Alexander Miller, by becoming party hereto, agrees to select from the good securities before referred to, which shall be brought into the distribution of the auditors aforesaid, at least two-thirds of the balance of the share which shall be due him after deducting all payments of money, stock, &c., up to the time of the report, provided such an amount of good securities shall be then outstanding, which securities shall be forthwith assigned and transferred to him by the said Samuel, on the report of the auditors aforesaid.

"That the auditors aforesaid shall pass upon both of the accounts before mentioned, and shall make distribution after deducting the payments made to all or either of the parties, by the said Samuel, on account of their distributive shares respectively.

"That all receipts of money by the said Samuel as executor or trustee, since the filing of his accounts aforesaid, shall be brought into the distribution, and that all moneys paid out by the said Samuel on account of said estate for the payment of which said estate was legally liable, shall be credited by the auditors aforesaid. And further, that the report of resettlement and distribution made by the said Isaac C. Wikoff, Benjamin F. Arndt, and George W. Yates, the auditors aforesaid, or the majority of them, when made and filed in the Orphans' Court and the Court of Common Pleas of Northampton county, shall be final and conclusive upon them, and each and all of them, and that no exception or appeal shall be taken thereto by any or either of the parties interested, but the same shall be held firm and stable for ever.

"And the said Samuel hereby agrees, on the report of the auditors aforesaid, forthwith and without objection or delay, to satisfy and resettle, pay and discharge to the parties hereto respectively, the balance of his or their distributive share or shares according to the report to be made by the auditors aforesaid.

"And for the true performance of the covenants and agreements herein contained, the parties bind themselves firmly by these presents.

"In testimony whereof, we have hereunto set our hands and seals, this 18th day of November, in the year of our Lord 1850.

"This agreement to be attached to the report of auditors."

"Signed, sealed, and delivered in the presence of HENRY F. STECKEL."

SAMUEL WILHELM,          [Seal.]
ALEX. MILLER, adm.,     [Seal.]
J. M. PORTER,           [Seal.]
M. H. JONES.            [Seal.]

Under this agreement the auditors proceeded, and resettled Wilhelm's accounts as executor and trustee, making many important changes in them, which, however, are not necessary to be here stated, inasmuch as the parties were held bound by the above agreement of the 18th November 1850.

In the distribution, Wilhelm claimed two-fifths of the balance in his hands as executor and trustee, by virtue of the agreement of the 18th February 1848. This was resisted by Alexander Miller, the administrator of Peter Miller of Ohio, who had died during the pendency of the audit, on the ground, that it had been obtained by fraud, and was otherwise void as against the policy of the law.

Much evidence was taken by the auditors in reference to the manner in which this agreement was obtained by Wilhelm; and the following deeds, &c., were given in evidence by him, which it was contended amounted to a ratification and confirmation of that agreement. 1. A deed, dated the 5th September 1849, whereby Peter Miller of Ohio, and wife, conveyed to Samuel Wilhelm two-fifths of this estate. 2. A letter of attorney, dated the 12th December 1849, from Peter Miller and wife, to John Miller; which did not appear to have any material bearing on the case. 3. A deed of partition, dated the 27th December 1849, between Peter Miller and wife, and Samuel Wilhelm. 4. Two deeds, dated the 21st November 1849, between Messrs. Porter and Jones of the one part, and Miller and Wilhelm of the other, in which, among other things, Miller and Wilhelm conveyed to Porter and Jones one-fifth of the estate. 5. A refunding-bond of Peter Miller of Ohio, to Samuel Wilhelm, dated the 12th December 1849, which acknowledged that Peter Miller had received, *as his share*, two-fifths of 500 shares of Easton Bank stock. 6. A receipt, dated the 25th April 1850, from Alexander Miller, administrator of Peter Miller of Ohio, to Samuel Wilhelm, for two-fifths of the proceeds of a certain tract of land, &c.

The auditors reported that the agreement of the 18th February 1848 was obtained by fraud, imposition, and undue advantage taken of the heir at law, by Wilhelm; and that it was in plain violation of his duties as trustee under the will of the testator. They, therefore, distributed the balances in both accounts, four-fifths to Alexander Miller, administrator of Peter Miller of Ohio, and the remaining one-fifth to be divided between Messrs. Porter and Jones.

The court below, being of opinion that the agreement of the 18th November 1850 had made the reports of the auditors in reference to the adjustment of the accounts, conclusive between the parties, confirmed the same so far as it resettled the accounts of Wilhelm, as executor and trustee; but set aside so much of the same as rejected his claim to share in the distribution. And

decreed two-fifths of the balance to Alexander Miller, administrator of Peter Miller of Ohio, two-fifths to Samuel Wilhelm, and the remainder to Messrs. Porter and Jones.

From these decrees both parties appealed to this court. Alexander Miller, from so much of the decrees as admitted Wilhelm to share in the distribution; and Wilhelm, from so much of them as confirmed the report of the auditors resettling his accounts.

*Reeder*, for Alexander Miller, appellant.—We resist the decree which adjudges a share of the balance in hand to Wilhelm, under the agreement of the 18th February 1848, on the following grounds:—

1. That there was mistake of law and fact, in the very matters mentioned in the agreement, as the only inducements to make it, to wit, that there were doubts as to Peter Miller being the heir at law and able to prove it; and that, if Miller failed in his suit, Wilhelm could sue and recover, and share the proceeds with Miller. If either of the parties believed either of these allegations, as stated in the agreement, they were at least mistaken in law and fact.

2. Concealment and misrepresentation, by Wilhelm, in the material inducements of the contract, accompanied with other evidence of fraud in fact, and undue advantage taken of Peter Miller, such as threats of litigation for life unless he would give Wilhelm a share of the estate, secreting him from his son, intoxication, and taking advantage of his necessities by giving him $100 apparently as a donation, which he subsequently converted into a charge on account of his share; all of which were aggravated in their unfairness in view of Peter Miller's age and poverty: *Story's Eq.*, §§ 251, 222, 239, 204-7; 1 *Ev. Pothier on Oblig.* n. 25, note *a*, p. 18; Martin *v.* Morgan, 1 *Brod. & Bingh.* 289; 4 *Bro. P. C.* 497; Broderich *v.* Broderich, 1 *P. Wms.* 240; Perkins *v.* Gay, 3 *S. & R.* 331; Bishop *v.* Reed, 3 *W. & S.* 265; Miles *v.* Stevens, 3 *Barr* 21; *Story's Eq.*, §§ 131, 140, 217; Pickering *v.* Pickering, 2 *Beavan* 31, 56; Henley *v.* Cooke, 4 *Russell* 34; Gordon *v.* Gordon, 3 *Swanst.* 476; Frank *v.* Frank, 1 *Ch. Cas.* 84; Dunnage *v.* White, 1 *Swanst.* 137; Evans *v.* Llewellin, 1 *Cox* 333; s. c. 2 *Bro. Ch.* 150; Bowles *v.* Stewart, 1 *Sch. & Lef.* 209, 224.

3. Absence of all actual consideration, that expressed in the agreement being only fictitious and pretended.

4. That the contract was illegal and contrary to the policy of the law, as tending to produce unfaithfulness in a trustee, and actually creating in him a private interest hostile to the trust; and resulting in the scandalous spectacle of an executor publicly appearing as defendant and paying for the defence from the funds of the estate, whilst he was under written obligation to pay

"an equal proportion of the costs and expenses" on the part of the plaintiff, and to share in the fruits of the recovery: *Story's Eq.*, § 295; 2 *Kent's Com.* 466; Bowers v. Bowers, 2 *Casey* 74; Wiley's Appeal, 8 *W. & S.* 244; *Chit. on Contr.* 673.

5. Fraud in law, as nothing could pass by the agreement except from *cestui que trust* to trustee.

6. There is no such thing in the law as a ratification of a void contract such as this. There may be an entirely new contract for a new consideration, but a mere confirmation or ratification of the old one is unknown to the law and cannot exist: *Story's Eq.* § 298, 300, 302; St. John v. St. John, 11 *Ves.* 535; Smith v. Bromley, 2 *Doug. R.* 696; Hatch v. Hatch, 9 *Ves.* 292; Roberts v. Roberts, 3 *P. Wms.* 66, and notes; Browning v. Morris, *Cowp. R.* 790; Morris v. McCullock, 2 *Eden R.* 190, and note 193; Goldsmith v. Bruning, 1 *Eq. Abr. Bonds, &c., F.* 4, p. 89; 1 *Fonbl. Eq.* B., 1, ch. 2, § 13 and note; Smith v. Bruning, 2 *Vern. R.* 392; Morris v. McCullock, *Ambler R.* 432; 2 *Eden R.* 180; Osborne v. Williams, 18 *Ves.* 379; Woodhouse v. Meredith, 1 *Jac. & Walker* 224; 1 *Fonbl. Eq.*, B. 1, ch. 4, § 4, note *y;* Bosanquet v. Dashwood, *Cas. T. Talbot* 37, 40, 41; Holbrook v. Sharpey, 19 *Ves.* 131.

As to the undisposed residue of the estate, the executor is to be treated as trustee for the next of kin: 2 *Fonbl. Eq.* B. 4, ch. 1, § 4, note *d; Id.* B. 2, ch., § 3, note *k;* 1 *Mad. Ch. Pr.* 466; *Story's Eq.*, § 1067.

The well understood rule is, that the contract is voidable at the arbitrary option of the *cestui que trust*, and without any proof of imposition, advantage, misrepresentation, concealment, undue influence, or intimidation, and solely upon the footing of the relation between the parties: *Newland on Contr.* p. 461; 1 *Mad. Ch. Pr.* p. 92; *Story's Eq.* 322; 6 *Ves.* 625; 13 *Ves.* 601; 5 *Ves.* 678; 10 *Ves.* 381; 2 *Johns. Ch. R.* 252; 4 *How.* 503.

An agreement only voidable, as one between *cestui que trust* and trustee, without actual fraud, may be ratified, for it has a contingent vitality; but one actually void is a nullity, and can never be. There is no such thing known to the law, because it is an absurdity to speak of confirming that which has no existence originally. "*Quod ab initio non valet tractu temporis non convalescit:*" Duncan v. McCullough, 4 *S. & R.* 483; Chamberlain v. McClurg, 8 *W. & S.* 36; Jackson v. Summerville, 1 *Harris* 360.

7. By agreement of 18th November 1850, the appellee bound himself to submit to the final decision of the auditors, and they having decided against him, the question of the validity of the original agreement is for ever closed as respects the balance of personalty now in dispute: Mussina v. Hertzog, 5 *Binn.* 387; Andrews v. Lee, 3 *P. R.* 99; Gallup v. Reynolds, 8 *Watts* 426; Rogers v. Playford, 2 *Jones* 185; Ford v. Keen, 1 *Harris* 179;

Brower *v.* Osterhout, 7 *W. & S.* 344; Bingham's Trustees *v.* Guthrie, 7 *Harris* 419.

The appeal from the decree of the Common Pleas depends on the same principles: Light *v.* Light, 9 *Harris* 412; *Story's Eq.*, § 308.

*A. E. Brown*, for Samuel Wilhelm, appellee in Miller's Appeals.—Wilhelm's claim was not based on the agreement of the 18th February 1848, but upon the subsequent deeds and conveyances, freely given and executed by Peter Miller of Ohio, after the final decision of this court had placed him in the full and undisturbed possession of the whole of the residue of the estate.

This case has been treated by the appellant as though Miller and Wilhelm had combined to set aside and destroy the will of the testator. But there is no question made as to the will itself. The question arises upon the validity of the trusts, and whether they were such as the law will allow to be executed; and this authority could be pursued with perfect propriety by either the heir at law, the executor, or trustee, or whoever had charge of the funds, and was interested in the execution of the trust: *Adam's Eq.* 59; Wood *v.* Vandenburg, 6 *Paige* 277; Attorney-General *v.* Vivian, 1 *Russ.* 226; Re Masters of Bedford Charity, 2 *Swanst.* 525; Attorney-General *v.* Oglander, 1 *Ves.* 246.

Samuel Wilhelm had only a naked custody of the residue of the estate; the two congregations were to hold the property and administer the fund: Wheatly *v.* Badger, 7 *Barr* 459; Brown's Appeal, 2 *Jones* 333; Ross *v.* Barclay, 6 *Harris* 179. He was, therefore, justified in taking the opinion of the court as to the validity of the trusts upon which it was directed to be conveyed.

The deed of the 5th September 1849, being under seal, imports consideration, and even if the original agreement was obtained by duress (of which there is no testimony) would cure all defects in Wilhelm's title: Jackson *v.* Summerville, 1 *Harris* 368. No third parties are here complaining; and this deed is good against the representatives of Miller: Sherk *v.* Endress, 3 *W. & S.* 255, 266–7; Fox *v.* Cash, 1 *Jones* 207; Lestapies *v.* Ingraham, 5 *Barr* 81; Evans *v.* Dravo, 12 *Harris* 62.

We deny that Wilhelm was a trustee for Miller. By the will he had a naked charge of the property; they were rival claimants for this inheritance. We deny, also, that a trustee is prohibited from buying from *cestui que trust.* Such purchases are not void, either in law or in equity. They will be scrutinized more closely than if they were between strangers; but they may be effected, and will be good, if not assailed successfully on the ground of undue advantage: *Hill on Trustees* 537–539; Fisk *v.* Sarber, 6 *W. & S.* 21.

But it is said, we are asking for a decree. This is not so; an

executor has a right to retain: Wilson's Estate, 2 *Barr* 329; Beck *v.* Beck, S. C. not reported; Loomes *v.* Stotherd, 1 *S. & S.* 458; 2 *Williams on Ex.* 896.

The Orphans' Court is one of limited jurisdiction; they had no authority to set aside the conveyances to Wilhelm on the ground of fraud: Mehaffey *v.* Dobbs, 9 *Watts* 363; Brinker *v.* Brinker, 7 *Barr* 55; Grider *v.* McClay, 11 *S. & R.* 231; Robinson *v.* Zollinger, 9 *Watts* 169; Ragan's Estate, 7 *Watts* 438; Dyott's Estate, 2 *W. & S.* 557; Byrne *v.* Walker, 7 *S. & R.* 483; *Gordon on Decedents* 319; *Hood on Executors* 420; Harland's Accounts, 5 *Rawle* 329.

The agreement of the 18th November 1850 conferred no power upon the auditors to draw in question the validity of Wilhelm's deed, and his right of possession under it. The consent of the parties could give them no authority beyond that of their own appointment: Bloom's Appeal, 3 *Harris* 403; Bellas *v.* Dewart, 5 *Harris* 85; Philadelphia Life Ins. Co. *v.* American Life Ins. Co., 11 *Harris* 67; 2 *Pars. on Cont.* 11; Lehigh Coal and Navigation Co. *v.* Harlan, 3 *Casey* 439. The fact that there was an agreement not to except cannot prevent the court from interfering in a proper case: Horton *v.* Stanley, 1 *Miles* 418; Wilson *v.* Young, 9 *Barr* 101.

*Ihrie,* for Samuel Wilhelm, appellant, assigned various errors in reference to the resettlement of the accounts in the courts below, whereby certain matters were charged to the accountant, and other items of credit were disallowed, and cited numerous authorities in support of these exceptions. The opinion of the court, however, renders unnecessary a reference to them in this report.

The opinion of the court was delivered by

WOODWARD, J.—When Samuel Wilhelm settled his accounts, one of them in the Orphans' Court, as one of the executors of the last will of Peter Miller, and the other in the Common Pleas, as trustee under the same will, it was according to the usual course to refer them to auditors, to examine, and, if necessary, to resettle them and make distribution. And as both accounts arose out of the same estate, under the same will, and differed no otherwise than as one related to the personal estate of the testator, and the other to the proceeds of his realty, it was convenient to refer both to the same auditors.

As originally constituted, then, it was simply an ordinary audit. What the auditors would do, was to be reported to the respective courts, to be reviewed, set aside, modified, or confirmed; and the effective and binding character of the proceeding would depend

on the final decree of the court, rather than on the action of the auditors.

The auditors first assembled on the 24th June 1850, and after various meetings and adjournments without making much progress in their work, they met on the 28th July 1851, when the agreement of 18th November 1850, signed by the appellant and appellee, and by Messrs. Porter and Jones, was laid before them, and under which, thereafter, they acted.

As various questions, more or less important, arise out of this paper, it is proper to consider its meaning and effect.

It begins by reciting the filing of Wilhelm's accounts and the reference of them to this board of auditors for examination, resettlement, and distribution, and then the parties go on to agree—

1. That the auditors shall proceed to resettle the account, and make distribution.

2. That the accountant shall be charged with certain bonds and mortgages therein specified, and that Alexander Miller shall be permitted to select from the securities brought into distribution, to the amount of two-thirds of the distributive share that shall be coming to the estate of his deceased father.

3. That distribution should be made "after deducting the payments made to all or either of the parties hereto, by the said Samuel, on account of their distributive shares respectively."

4. That all receipts and payments by the said Samuel since his accounts were filed, should be brought into the settlement.

5. That the report of resettlement and distribution to be made by said auditors, when filed in the Orphans' Court and Court of Common Pleas of Northampton county, should be final and conclusive upon them, and each and all of them, and that no exception or appeal should be taken thereto by any or either of the parties interested, but the same should be held firm and stable for ever.

6. And, finally, that the said Samuel should, on the report of the auditors, forthwith, and without objection or delay, satisfy and settle, pay and discharge to the parties hereto respectively, the balance of his or their distributive shares, according to the report to be made by the auditors.

Under their appointment by the court, and this agreement of the parties, the auditors resettled Wilhelm's accounts, making many essential changes in them, and excluded him altogether from any share as a distributee of the estate. On exceptions filed to their report, the court confirmed their resettlement, on the ground that it was final and conclusive between the parties, by virtue of the aforesaid agreement, but they reversed so much of the report as excluded Wilhelm from the distribution; and from this decree Miller appeals to this court.

It is insisted upon with great earnestness, that these parties were incompetent to take away, by their agreement, the supervisory

power of the court, and to make the report of the auditors conclusive.

Unquestionably, the parties to the agreement could not abridge the powers of the court, nor bind creditors or others in interest; but why could they not bind themselves to waive their right of exception to the report, and to abide by and perform the awards of the auditors ?

If they were the only parties interested in Peter Miller's estate, and there is no evidence of the interest of others, they were as competent to agree upon this mode of settlement and distribution, as heirs and devisees are, to agree on partition, or on men to make partition, or as parties litigant are, to submit their disputes to arbitrators mutually chosen.  And such agreements are not in derogation of the jurisdiction and authority of the courts.  On the contrary, the courts encourage parties to settle their differences in their own way, only so they do not confuse the judicial records.

Accordingly, we enforce the agreements of parties when they provide such domestic tribunals for themselves, or even enlarge the jurisdiction of arbitrators constituted under our compulsory arbitration laws : 7 *Harris* 418.

Nor is there anything in the nature of the office of auditors to make them an exception to the general rule.

Auditors are called in by the court, to hear matters of detail which the court has not time to hear, and to inform the conscience of the court as to facts which are essential to be known, before a particular decree or judgment can be pronounced.  Distribution of a decedent's estate is a judicial duty, and yet, under our Acts of Assembly, it may be performed by the executor at his own risk.

He has a right, however, to bring the assets into court for distribution, and then, instead of going into a minute settlement of his accounts, and into all those questions which may affect the distribution, the court refers the whole matter to auditors, in strict analogy to the references of a chancellor to a master.  An appeal lies from the report of the auditors; but this is a mere personal right, not a legal necessity in the proceedings, and therefore it may be waived.

Mr. Wilhelm was free to make settlement and distribution in this manner.  He was competent to bind himself, and he is bound.  The consideration for his agreement was in the agreement of the others in interest.  The agreement did not unsex the auditors.  They were auditors still, the courts' auditors, bound to report to the courts, and the records of the courts were to be the depository and memorial of the auditors' labours.  Nor did it take away the courts' right to revise the report, it only destroyed the parties' right to except to it.

But how far ?  That the agreement made the *settlement* final cannot be doubted.  If it is to have any operation, it must operate

to this extent at least. And I think it equally clear, that the terms and manner of distribution, as between these distributees, were to be finally adjusted by the auditors; but it is not so clear that they were to inquire and determine finally who the distributees were. True, distribution could not be made without ascertaining the distributees, and there are expressions in those parts of the agreement, which I have numbered 3 and 6, where the parties speak of payments to be made by the said Samuel, that would seem to imply that he was before the auditors only as accounting executor and trustee, and that it was among the others distribution was to be made.

Notwithstanding this, however, we are to remember that Wilhelm claimed to be equally interested with Peter Miller by virtue of the agreement of 18th February 1848, and that Porter and Jones came in for twenty per cent. of the estate by virtue of their agreement of the same date with Miller and Wilhelm. Peter Miller was the heir at law of his uncle, and if the large devises in trust contained in his uncle's will could be set aside, he would succeed to the bulk of the estate. He first agreed to divide his contingent interest with Wilhelm, and then they jointly agreed to compensate the professional services of the other two gentlemen, by giving them, in the event of success, one-fifth of the estate—leaving two-fifths of it for each of themselves. This was the posture of affairs when the agreement of 18th November 1850 was executed. As between themselves, each was considered entitled to a share, and they, no doubt, executed the agreement of November 1850 with that understanding. The distribution spoken of in the agreement was to be made among them. Of course it was *that* distribution only—a distribution in which each of themselves was to participate—that they agreed to be bound by.

I think we should give this agreement more effect than it was intended it should have, if we should hold it to conclude Wilhelm's rights as a distributee. His title, as such, was properly passed on by the auditors, but not conclusively, because the law would assign no such effect to their action, and the agreement of the parties did not reach so far.

The question that arose then, upon his exceptions to the report, was, whether the auditors decided rightly, in excluding him from the distribution. The court below thought they did not.

Wilhelm's right to share in the distribution originated, as already stated, in the above-named agreement with Peter Miller, of 18th February 1848. He claimed that it had been ratified and confirmed by various writings subsequently, particularly by the letters of Peter Miller to him of 1848 and 1849—by the deed of 5th September 1849—by the letter of attorney, of December 1849, and the deeds of partition made thereunder, and by the receipt

[Miller's Appeals.    Wilhelm's Appeals.]

of Alexander Miller, administrator of Peter Miller, of 15th April 1850, for his father's share of the Petersville mill property.

All these papers, and many more, were in evidence, and the parties were very patiently and fully heard.

The auditors put their decision on two principal grounds—

1st. That the agreement of 18th February 1848 was obtained through actual fraud.

And 2d. That as Wilhelm was acting as executor and trustee under the will, it was against the policy of the law to permit him to acquire an interest adverse to, and inconsistent with the trust.

The first of these grounds involved a question of fact, on which the report is, according to law, and independently of all agreements of the parties, final and conclusive, unless there was flagrant mistake: 7 *Harris* 222.

After the full hearing which the parties had on this question, at the very spot where the agreement was made, and all the evidence bearing on it was at hand, we would scarcely reverse the finding of a tribunal of their own choosing, or justify the court below in doing so, except upon the most manifest evidence of flagrant mistake.    So far from having such evidence, we have, in the report of the auditors, proofs strongly persuasive of the alleged fraud, and we cannot say that the auditors misjudged these proofs.

It followed then, as a necessary sequence, from the finding of actual fraud in the concoction of the agreement of 18th February 1848, that all the subsequent agreements, conveyances, and receipts, referring to it, and bottomed on the same consideration, could not amount to confirmation.    The doctrine that, where there has been actual and positive fraud, there can be no such thing as a confirmation—that what was once a fraud will always be so—that a contract infected with this kind of fraud is not merely voidable but void—and that confirmation without a new consideration is mere *nudum pactum*—was very distinctly asserted in Duncan *v.* McCulloch, 4 *S. & R.* 487.

And see Butler *v.* Haskell, 4 *Dessaussure's R.* 707 (South Carolina), for a very learned and comprehensive discussion of this subject and the authorities relating to it.

These confirmatory acts and documents might avail to validate a contract merely voidable, and there is a class of cases, where the parties to a fraudulent or even an illegal contract have fully executed it themselves, in which courts of justice will not interfere to unravel their doings, but, considering them in *pari delicto*, will leave them bound as they find them: 5 *Barr* 81; 12 *Harris* 62; 1 *Jones* 212; 3 *Casey* 90.    A contract, however, which remains to be executed, which stands in need of the decree of a court of justice to enable the parties to reap its fruits, and which is successfully impeached as covinous and fraudulent in fact, is easily distinguished from all such cases, and rests on a foundation of sand.

It was said, in the argument, that Wilhelm was asking for no decree, but the position cannot be maintained.   The auditors cut him off, and without a decree of the court below in his favour he had no lot or part in the distribution.   He sought and obtained the decree of the court below, and that is the very thing under consideration here.   The question on this appeal is, whether the decree that Wilhelm obtained, restoring him to the place he claimed in the distribution, shall be confirmed or reversed, so that, although Miller took the appeal, it is Wilhelm's title and nothing else that is in controversy.   True, it relates only to the personalty, and the rents, issues, and profits of the realty of the decedent, but Wilhelm's right to share in these depends on no executed act of the parties, but on the decree to be pronounced by this court.   He is subject, therefore, to the rule of law that forbids the court to carry into effect a fraudulent contract.

But if this case were not to be put on the ground of actual fraud in the procurement of the contract under which Wilhelm claims—if we should even go so far as to reverse the verdict of the auditors on this mere matter of fact—the other ground of decision assumed by the auditors, that the policy of the law forbids an executor and trustee to deal with the estate intrusted to his charge in the manner exhibited in this case, would remain, and would be fatal to the pretensions of Wilhelm.

He was not compelled to assume the offices of executor and trustee; but, having assumed and retained them, he was bound, by the best defined principles of law and equity, to execute them with an eye single to the will of the testator and the interest of those for whom the testator provided.   That a trustee is not at liberty to act or contract for himself, or for his own benefit, in regard to the subject of the trust; that the advantage of all he does about the trust property shall accrue to the *cestui que trust*, if the latter desire it; that an interest hostile to the *cestui que trust* is repugnant to the relation which the trustee has assumed; that the *cestui que trust* has a claim to his entire services about the subject which has been confided to him, including all the knowledge, influence, and power which the trustee obtains from his situation; in a word, that a man who is intrusted to manage for others, undertakes, when he becomes a trustee, not to manage for himself; these rudimental principles of equity have been discussed, illustrated, and applied in so many cases, that, instead of citing them, I refer to the cases of Keech *v.* Sanford and Pitt *v.* Mackreth, and the notes thereto, in 1 *Leading Cases in Equity*, by *White & Tudor*, Am. Ed. by *Hare & Wallace*, pp. 70 and 148, where the cases, both English and American, will be found collected and arranged.

Nor can executors or administrators be permitted, under any

circumstances, to derive a personal benefit from the manner in which they transact the business or manage the assets of the estate. See the notes above referred to, and *Story's Equity*, § 322–323.

The very title of executor implies that he is to do his utmost to carry out the purposes of the will. " He is termed *executor testamentarius*," says *Swinburn*, part vi. p. 362, "because he hath his authority immediately from the testator, representing the person of the dead man. And he doth not much differ from him, in nature, whose name in the civil law is *Hæres*, saving that *Hæres* by the civil law is to have the residue of the testator's goods, and may convert the same to his own use, albeit the testator do not expressly will that he should have the same; whereas an executor *may not convert the residue to his own private use, nor any part of the testator's goods, more than that which is left unto him by the testator*, or which the ordinary shall allow him for his travel and charges."

This is a somewhat antiquated but still very accurate description of the duties of one of the offices assumed by Wilhelm.

" The ground on which these disabilities and disqualifications rest, is no other than that principle which dictates that a person cannot be both judge and party. No man can serve two masters. He that is intrusted with the interest of others cannot be allowed to make the business an object of interest to himself, because, from the frailty of nature, one who has the power will be too readily seized with the inclination to use it for serving his own interest at the expense of those for whom he is intrusted. The danger of temptation does, out of the mere necessity of the case, work the disqualification. The wise policy of the law puts the sting of disability into the temptation, as a defensive weapon against the strength of the danger that lies in the situation :" 1 *Leading Cases in Equity* 161.

A trustee, it is said, may bargain with his *cestui que trust*. So he may, if it be, in all respects, a fair and conscionable contract, and especially if it stipulate that he shall no longer act as trustee. But even then, said Lord ELDON, in Ex parte Lacey, 6 *Vesey* 629, the transaction by which the trustee is dismissed " must be watched with infinite and most guarded jealousy."

But this principle has no application to this case, for here there was no dismissal of the trustee, and no attempt on his part to withdraw from the trust. Nor did he bargain with the *cestuis que trust*, who were the devisees in the will, but with the heir at law, who was their antagonist. He bargained *against* his *cestuis que trust*, instead of treating with them. If a treaty with them for his own advantage would have been regarded with jealousy, how much more the traffic in which he engaged to their prejudice, whilst he continued their professed representative.

[Miller's Appeals.　Wilhelm's Appeals.]

The report of the auditors exhibits a melancholy picture of disloyalty on the part of Wilhelm to the trust he was appointed to guard.

From a very early day after the death of the testator, we find him plotting to overthrow the main provisions of the will, and placing himself in combination with the heir at law to divert the bulk of the estate from its appointed destination, and to appropriate it to the private use of themselves and their counsel.

The heir at law had a perfect right to question the will. The counsel had a right to serve him. And Wilhelm, if he wanted to take part with them, might have done so by retiring from the trust, and leaving the defence of the estate to his colleagues in the administration, or to successors whom the court would have appointed. But to continue in the trust, apparently that he might the better betray it, was to deprive himself of all chance of reward. If he had obtained the share of the estate he grasped at, perhaps the law would not interpose to restore it to a party who was with him in the unlawful league. That question will arise fairly upon the deed made for the real estate; but, in respect to the personalty, which is all that is now in contest, Wilhelm has no title to more than the will gave him, and can have none, for we will not enforce the contract under which he claims.

> And now, to wit, 15th July 1858, these causes having been argued by counsel, and considered by the court, it is adjudged and decreed, that the decree, in each case, be reversed and set aside, so far as the same admits Samuel Wilhelm to a distributive share of the personal estate of Peter Miller, deceased, but affirmed as to all else therein contained; and that the costs be paid by the parties in equal parts; and that the record be remanded that distribution may proceed according to law.

In Wilhelm's Appeals, the opinion of the court was delivered by WOODWARD, J.—The opinion expressed in Miller's Appeals, herewith decided, on the effect of the agreement made by the appellant and others to abide by the report of the auditors, concludes the appellant's right to except or appeal, and the decrees of the court dismissing his exceptions are accordingly affirmed.